In the Matter of ELLINGSEN Mac-LEAN OIL COMPANY, INC., and related cases, Debtor.

UNSECURED CREDITORS' COMMITTEE MOBIL OIL CORPORATION, Ellingsen Mac Lean Oil Co., Inc.

v.

FIRST NATIONAL BANK & TRUST CO. OF ESCANABA, the Northern Trust Co.

No. M85-332 CA2.

United States District Court, W.D. Michigan, N.D.

April 30, 1986.

---

Robert W. Sawdey, Jonathan Thoits, Day, Sawdey, Flaggert & Porter, Grand Rapids, Mich., for Unsecured Creditors' Committee, appellant.

Timothy J. Curtin, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., for Mobil Oil Corp., appellant.

David F. Heroy, Barbara A. Zahs, Gardner, Carton & Douglas, Chicago, Ill., for The Northern Trust Co., appellee.

Thomas L. Butch, Escanaba, Mich., for First Nat. Bank.

Donald W. Bays, Marquette, Mich., Herbert Wolas, Robinson, Wolas & Diamant, Los Angeles, Cal., for Ellingsen MacLean Oil.

## OPINION

MILES, District Judge.

This appeal stems from a final order of the United States Bankruptcy Court for the Western District of Michigan, Northern Division. The umbrella bankruptcy proceeding from which this appeal comes involves thirteen debtors. These debtors are thirteen oil companies who provide, among other services and products, home heating oil to families in the Marquette, Michigan area. The debtors as "debtors in possession" were all operating under a Chapter 11 reorganization at the time the order at issue was entered.

On December 21, 1984, after an emergency telephonic hearing, the bankruptcy court entered an order (hereinafter, referred to as the Christmas order) authorizing the settlement of an alleged controversy regarding the validity of the secured position of the two largest secured creditors as consideration for those creditors' agreement to advance additional emergency credit for the benefit of the debtors. The

advances were used by the debtors to purchase home heating oil for distribution to their customers in Marquette during Christmas week. The two creditors, the Northern Trust Company and the National Bank and Trust of Escanaba (hereinafter referred to as the banks), immediately advanced the debtors $60,000.00 in credit, and $175,000.00 was made available to these same debtors in the form of letters of credit.

The alleged controversy which was settled as consideration for this new extension involved loans made prepetition to the debtors and secured with collateral held by the debtors. The largest of these debtors is the Ellingsen MacLean Oil Company. Apparently, the debtors operated substantially as one unit. The loan monies were placed in a single account, which was drawn on by all the debtors. As security for this mutual loan the debtors gave as security collateral possessed by each individual debtor. The unsecured creditors committee challenged the propriety of the securing of these loans by collateral of all the debtors. It was alleged that by securing the loans in that manner the banks had shaped a fraudulent conveyance of certain properties of some of the debtors.

The Christmas order was appealed to the United States District Court by the unsecured creditors committee and Mobil Oil Corporation (hereinafter the committee and Mobil). Mobil was the largest unsecured creditor. Neither the committee nor Mobil obtained a stay of the Christmas order pending appeal. That omission provides the basis for the present motion to dismiss by the banks. The motion to dismiss is based on 11 U.S.C. § 364(e) of the Bankruptcy Code which provides:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, *unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.*

(Emphasis supplied).

Appellants argue that their appeal should not be dismissed pursuant to this section because the credit was not extended in good faith, and thus contravenes section 364 and the transaction is void. Appellants' state that this bad faith was indicated by the fact that the loan itself was illegal on its face, as it allows for allegedly improper cross-collateralization of security. They also allege that the loan was authorized by the bankruptcy judge only after the banks tailored a false "emergency" and that there was insufficient notice of this emergency hearing.

The findings of fact made by the bankruptcy court are to be reviewed by this Court under the "clearly erroneous" standard of Fed.R.Civ.P. 52.[1] The facts of this case are not to be reviewed *de novo* by this Court. Such a *de novo* review of the facts could only be made in a reconsideration motions in front of the bankruptcy court pursuant to Fed.R.Civ.P. 60(b).[2]

### Discussion

Appellees' argument is very straightforward. Essentially, they assert that their loan to the debtors is protected from attack upon appeal because of the stay provision in section 364 of the Bankruptcy Code. The stay provision was added to the Code to ensure certainty for persons extending credit to a bankrupt under court authorization. One court noted that it was added to the Code to:

> overcome people's natural reluctance to deal with a bankrupt firm whether as

---

1. *See* Bankruptcy Rule 7052.

2. *See* Bankruptcy·Rule 9024. As the Court noted in *In Re Monach Circuit Industries, Inc.,* 41 B.R. 859, 862 (Bkrtcy.E.D.Pa.1984), upon recon-

sideration the party extending credit cannot rely upon the protection of section 364(e), as the court then reviewing the case is the original tribunal and not an appeals court.

purchaser or lender by assuring them that long as they are relying in good faith on a bankruptcy court's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge.

*In the Matter of EDC Holding Company, et al.,* 676 F.2d 945, 947 (7th Cir.1982).

The policy behind section 364(e) is not new to the Bankruptcy Code. For example, section 363 deals with appeals from orders of the bankruptcy court which authorize a trustee or a debtor to make a transaction in the ordinary course of business. Subsection (m) of that section provides in pertinent part that the reversal or modification on appeal of an authorization under section 363 of a sale or lease of property does:

> not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease *were stayed pending appeal.*

[11 U.S.C. § 363(m), emphasis added]. *See In re Vetter Corporation,* 724 F.2d 52 (7th Cir.1983); *also see Willemain v. Kivitz,* 764 F.2d 1019 (4th Cir.1985).

The Court observes that the legislative history of section 364(e) indicates that it is the analog to section 363(m). *See,* H.Rep. No. 595, 95th Cong., 1st Sess. 346–347; S.Rep. No. 989, 95th Cong., 2d Sess. 57–58 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5843–5844, 6302–6303.[3] Moreover, both section 363(m) and 364(e)

are similar to Rule 805 stated that a motion for a stay must ordinarily be made before one could appeal a bankruptcy order which issued a certificate of indebtedness or authorized a sale of property.

The policies behind section 364(e) are well established and grounded in common sense. The procedural safeguard forcing the request for a stay pending appeal serves to protect the rights of the lenders who extend credit. The good faith provision in that same section acts to protect the debtor, other creditors and the integrity of the bankruptcy court. Additionally, these same parties receive protection from section 364(c) which requires that the bankruptcy court not issue an order pursuant to section 364 except *after notice and hearing. See also* 11 U.S.C. § 102, and Bankruptcy Rule 2002. Finally, the creditors adversely affected by what they perceive as a mistaken order, or one entered after there had been circumstances amounting to a fraud upon the bankruptcy court, may move for reconsideration pursuant to Fed. R.Civ.P. 60(b).[4]

### 1. *Notice & The "Tailored Emergency"*

The Bankruptcy Code, section 364(c), provides that the trustee or debtor in possession may obtain credit or incur a debt only "after notice and a hearing." That phrase is defined by section 102 of the Code as meaning:

> such notice as is appropriate in the particular circumstances, and such opportunity for a hearing is appropriate in the particular circumstances; but

---

**3.** The portions of the House and Senate reports that deal with section 364(e) are virtually identical. Here is the excerpt from the Senate Report:

> Subsection (c) provides the same protection for credit extenders pending an appeal of an authorization to incur debt as is provided under section 363(1) for purchasers: the credit is not affected on appeal by reversal of the authorization unless the authorization and the incurring of the debt were stayed pending appeal. The protection runs to a good faith

lender, whether or not he knew of the pendency of the appeal.
[S.Rep.No. 989, 95th Cong., 2d Sess. 57–58 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5843–5844.]. The Court notes the obvious mechanical error in the report. The report states that section 364(e) is similar to section 363(*l*), not (m). The House Report states the same. It must be a mistake; because section 363(*l*) is not at all similar to section 364(e).

**4.** *See* Bankruptcy Rule 9024; *also see* footnote 2, *supra.*

(B) authorizes an act without an actual hearing if such notice is given properly and if—

(i) such a hearing is not requested timely by a party in interest; or

(ii) there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act.

 Because the interests of other creditors may be prejudiced through the granting of a section 364(c) priority, due process requires that such creditors receive notice and a chance to object to the priority at a hearing before the bankruptcy court. *See Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *In re Adamson Co., Inc.*, 29 B.R. 937 (Bkrtcy.E.D.Va.1983). Of course, in emergency situations the appropriate notice and hearing are not subject to the strict requirements of Bankruptcy Rule 1002. In the instant case, the record is clear that the notice provided was short. However, considering the circumstances, it cannot be said that adequate notice was not given to the parties. Nor can these same parties challenge the transaction on the grounds that they were not afforded a full and thorough hearing.

On Thursday, December 20, 1984, the debtors filed their "Petition for Authority to Settle Stay Litigation, To Amend Agreed Order, and To Obtain New Credit." The petition was filed with the ultimate goal of receiving new credit with which to purchase home heating oil the following Monday for delivery to approximately 1,200–1,500 customers during Christmas week. Accordingly, the petitioners requested an order finding that an emergency situation existed, thus authorizing a telephonic conference for the next day, Friday, December 21 at 3:00 P.M. The emergency finding was made by the bankruptcy court and the next day at the appointed time a telephonic hearing was convened. It is not exactly clear from the record exactly how all the parties were notified of the hearing; some received telex communications, some received letters, and others were notified over the telephone, while some people received word of the hearing through two or more of these mediums. Present at the hearing were counsel for First National Bank & Trust Company of Escanaba and counsel for the Northern Trust Company (the present appellees), counsel for Mobil and the unsecured creditors committee (the present appellants), counsel for the debtors, and counsel for the Lakeland Bank, one of the larger creditors.

This Court is satisfied that the bankruptcy court committed no error in holding the emergency hearing upon short notice. From the statements contained in the verified petition, and from his knowledge of the case gleaned from past proceedings between these very same parties, the bankrupty judge could very safely operate under the assumption that an emergency situation was present. Moreover, through the convenient convention of the telephonic hearing, the rights of the pertinent parties were preserved as they were afforded a full hearing before the bankruptcy court.

During the hearing, statements were heard from counsel and testimony elicited from two witnesses. The first was John Carey, the vice-president and chief financial officer of Ellingsen MacLean Oil Company and signator of the verified petition. Testimony was also heard from J.C. Bullock of the J.C. Bullock Oil Company.

At the hearing Mr. Carey testified at great length concerning the assets of the debtors. The bankruptcy court was informed that the debtors had only 120 gallons of home heating oil available in the Marquette area and already had orders for approximately 11,000 gallons. (Transcript of emergency hearing at pp. 9, 13). Furthermore, in their bank accounts, the debtors had absolutely no ready cash with which to purchase fuel oil. (Tr. at p. 20). The debtors were unable to receive financing from any other source because of their poor financial position as a bankrupt. He further testified that the only sources willing to meet the debtors' needs were the two banks. However, the banks would only extend further credit upon the condi-

tion that the debtors were willing to settle the controversy regarding the fraudulent conveyance argument. (Tr. at pp. 12, 43–44). The testimony of both Mr. Carey and Mr. Bullock corroborate each other as to the fact that within approximately ten days time, the debtors could shift their home heating accounts to other suppliers who could serve those customers. (Tr. pp. 22–23, 55, 58). However, the debtors were loathe to take that step because it would mean the loss of a major asset, those very same accounts. That would greatly reduce the going concern value of the debtor companies.

After hearing examination and cross-examination of these witnesses, the bankruptcy judge issued his order based on the hearing and the verified petition. In his order he acknowledged that he was authorizing more than merely further financing pursuant to section 364, he would in effect be terminating any challenge towards the alleged fraudulent conveyance. (Tr. pp. 68, 69). In a previous hearing, the bankruptcy court had noted that it was uncertain as to the status of the banks' security interest; although they appeared to be legitimate, it was possible to make a legal argument challenging their validity.[5] Nonetheless, in the Christmas Order, the bankruptcy court recognized the bargain presented by the banks as the only alternative to keep the debtors viable as a going concern. Accordingly, the order was signed by the bankruptcy judge on December 21, 1984.

■ Appellants have asserted arguments that the emergency was contrived by the banks; that the banks had backed down at the last minute from promises to keep funding the debtors, thus leaving the debtors sitting on a limb with no hope of receiving emergency funding from any other source during Christmas week. In essence, that argument necessitates a finding by this Court that not only where the debtors misled by the banks, but that the bankruptcy court was likewise conned into the

plan. This the Court cannot do because there are no plain facts on the record which could support such a finding of a "bank conspiracy." As the Court has indicated earlier in this opinion, had the appellants truly believed that the appellees had "duped" the bankruptcy court into signing an improper order, the proper recourse would have been to make a motion for reconsideration pursuant to Fed.R.Civ.P. 60(b).

Rather than finding the existence of a "bank conspiracy" this Court is convinced that the bankruptcy court made a justifiable ruling that an emergency existed. There exists no clear error which would allow this Court to overturn the findings of the bankruptcy court.

## 2. Good Faith

The central attack by appellants' against the loan extended by the appellees is that the loan was not extended in good faith and as such is inherently violative of section 364. Appellants point towards three factors to evidence this lack of good faith. The first two factors, insufficient notice and the "tailored emergency" were discussed in the previous portion of this opinion. The remaining argument focuses in on the form of the loan transaction. Appellants assert that the loan allows for illegal cross-collateralization. Furthermore, appellants assert that the appellees knew at the time the debtors sought authorization that the loan transaction called for such illegal cross-collateralization. Thus, that knowledge is indicative of bad faith.

The Bankruptcy Code does not supply a definition of good faith. The most used definition of the term is found in the Uniform Commercial Code at § 1–201(19): "Good faith means honesty in fact in the conduct or transaction concerned." Regarding section 364(e) and the good faith provision, one court noted that section 364 was intended to:

---

**5.** See Opinion on Substantive Consolidation signed by Judge Heitman of the Bankruptcy Court on December 19, 1984.

protect not the lender who seeks to take advantage of a lapse in oversight by the bankruptcy judge but the lender who believes his priority is valid but cannot be certain that it is, because of objections that might be upheld on appeal. If the lender *knows* his priority is invalid but proceeds anyway in the hope that a stay will not be sought or if sought will not be granted, we cannot see how he can be thought to be acting in good faith.

*Matter of EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir.1982). The Court further stated that:

Where it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code, the lender is not in good faith, and it is irrelevant what the improper purpose is.

*Id.* at 948. In that case, the Seventh Circuit held that the lenders had not acted in good faith because the lenders knew that a portion of the funds extended to the debtor was for an obvious improper purpose: to pay attorneys fees to certain creditors, which fees are not allowed payment under any provision of the Code.

■ Contrasting the facts of the *EDC Holding* case with the instant case supports dismissal of this appeal. In the present case, the funds were extended to the debtors for an undeniably proper purpose under the Code: to keep the debtors operating as a going concern by affording them an opportunity to service their customers.

Appellants argue that the improper purpose served by the agreement is that it grants the banks cross-collateralization of their security by allowing both prepetition and postpetition debts of the debtor to be secured by collateral acquired both prepetition and postpetition. In support, appellants cite to *In Re Monach Circuit Indus-*

*tries, Inc.*, 41 B.R. 859 (Bkrtcy.E.D.Pa. 1984).[6] This Court observes that while *Monach* may stand for the proposition that cross-collateralization places unsecured creditors in an unreasonable position, there are still numerous courts that have held cross-collateralization permissible in some circumstances. *See, In Re FCX, Inc.*, 54 B.R. 833, 840 (Bkrtcy.S.D.N.Y.1985); *In Re B & W Tractor Company, Inc.*, 38 B.R. 613 (Bkrtcy.E.D.N.C.1984); *In Re Antico Manufacturing Company, Inc.*, 31 B.R. 103 (Bkrtcy.E.D.N.Y.1983); *In Re Vanguard Diversified Inc.*, 31 B.R. 364 (Bkrtcy.E.D.N.Y.1983); *In Re Borne Chemical Company, Inc.*, 9 B.R. 263 (Bkrtcy.D.N.J.1981). Accordingly, this Court rules that unlike the lender in *EDC Holding*, the banks in the present case did not, nor could not, have a sound basis for "knowing" that their loans were illegal. All that could be said for that proposition is that at the time the petition was before the bankruptcy court, it was possible that the debtors and the banks were aware that certain legal arguments existed which opposed such a loan formulation. However, that is a far cry from having knowledge and certainty that a particular transaction is illegal or improper. Based on the relevant case law and the facts in the record, this Court must find that the banks and the debtors acted in good faith in promulgating the loan transaction. Thus, appellees will be afforded the full protection of section 364(e).

■ Finally, appellants raise the argument that regardless of the protection offered by section 364(e), the agreement must be voided by this Court because it is in reality a settlement of potential litigation and not just a financing agreement pursuant to section 364 of the Code. The Court acknowledges that the terms of the Christmas Order entail more than a simple extension of credit, however the Court refuses to

**6.** The Court in *In Re Monach*, 41 B.R. at 861–862 observed that cross-collateralization provisions should never be approved *ex parte*, but only after notice and a hearing. It also noted that in certain instances such a provision if properly authorized could constitute an unlawful preference in violation of 11 U.S.C. § 547(b). How-

ever, that court never approached the crucial issue regarding the impact of section 364(e) on attacks upon loans containing such provisions. The *Monach* court was making its review upon a motion for reconsideration and not upon appeal, thus the stay provisions of section 364(e) had no application.

characterize the order as purely a settlement of a controversy.[7] Accordingly, the guidelines set forth by the supreme Court in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968) do not have as direct application in this case as do the strictures of section 364 of the Code.

### Conclusion

Appellees motion to dismiss the appeal is GRANTED. The appeal is dismissed with prejudice.

IT IS SO ORDERED.

**7.** It was noted in *In re FCX, Inc.*, 54 B.R. 833 (Bkrtcy.S.D.N.Y.1985), that postpetition financing in a chapter 11 case is fraught with dangers for creditors. Accordingly, the frequent result "is a postpetition financing agreement calling for substantial concessions from the debtor, often at the expense of the rights of unsecured creditors." *Id.* at 838. It was that court's observation that without such financing a debtor's business may close and the going concern value of creditors' collateral be irretrievably lost, thus increasing loss to *all* creditors. This Court agrees that in appropriate situations, it would be necessary, and indeed prudent, for a postpetition debtor to enter into a "hard" bargain with a creditor in order to acquire needed funds to complete a reorganization.

Some of the terms of the bargain reached between debtor and creditor may reach beyond the usual terms of a loan agreement. However, such terms are perfectly normal considering the "unusual" situation of a bankrupt firm. In such situations the bankruptcy court would rightfully be more interested by the requirements and provisions of section 364 of the Code, than it would be by a picayune examination of every legal argument that could be brought against separate provisions of the proposed agreement. Especially since after authorization by the bankruptcy court, such arguments are not considered foreclosed unless the concerned parties do not obtain a stay of the order. Thus, if such an omission occurs, than a situation arises against which section 364(e) was particularly drafted to protect.